UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | DOCKET NO.: 19-CR-10280-PBS |
| ) | |
| DONELL PHILLIPS ) | |
| ) | |

**<u>SENTENCING MEMORANDUM</u>**

Over the last several months, Mr. Phillips has contemplated his choices that led to his incarceration, and thought about what he needs to do to avoid ever returning to a prison setting. This reflection occurred within the climate of fear and anxiety pervading correctional institutions during the current pandemic. His primary thoughts focus on his family, and his desire to see them again. Mr. Phillips deeply regrets putting his loving and supportive family through the shame, embarrassment, and heartache of this ordeal, caused by his irresponsible conduct. He now seeks to be held accountable for that conduct, and held responsible for the changes he must now make in his life.

He is 33 years old, father of two children (10 and 12), one who is diagnosed with epilepsy. Mr. Phillips suffers from a serious and untreated substance use disorder. Undeniably, possession of firearms by a prohibited person is a very serious offense. Mr. Phillips fully recognizes the low point he was at in his life when he committed these crimes. He had lost his job as a chef on the Boston Spirit cruise ship, and found no other employment. He was using alcohol and drugs, living in a rooming house, and depressed. He recognizes that he needs help.

1

His family continues to support him, and has in some ways grown more connected to him during the frequent phone contact over the last several months. She writes:

> "When I talk to my brother I do hear the change and regret in his voice especially now that I am currently expecting my first child and he is/will be missing out on it. I am in fact his only sister everything I go through we talk about and he is there whether it's good or bad my brother is always by my side cheering me on or offering advice. It make me happy when he calls and to hear him talk about what will I name my baby and how am I handling pregnancy physically and emotionally. It shows me despite where he is no matter what my brother will always be concerned about me and the rest of the family." Exhibit A, letter from Victoria Phillips.

Mr. Phillips accepted responsibility for the two charges in his indictment: possession of two firearms on two occasions during the summer of 2019. Mr. Phillips has been in custody based on this conduct since June 7, 2019, although he did not enter into federal custody until September 20, 2019. Based on a fair consideration of the advisory guidelines as well as the required 3553(a) factors, Mr. Phillips asks the court to impose a sentence of <u>21 months, followed by 3 years of supervised release, with special conditions of release to include substance abuse counseling, mental health counseling, and vocational training.</u>

This requested sentence also asks this court to take into account what jail time is like at this moment in time. First, the circumstances are far more stressful for those incarcerated, and the prison facilities have far less mental health resources to safely handle these struggles. Second, due to the safety precautions, there are far less opportunities for programming and rehabilitation. These deficits matter. For a person like Mr. Phillips, who has only served a single 60 days sentence prior to this period of incarceration, this period of pretrial custody has been frightening, stressful, and stagnant. Due to the necessary COVID precautions in the jail setting, Mr. Phillips is on lockdown most hours of the day. These circumstances have made the time

2

done to date much harder, much more restrictive, and with no opportunity for any kind of pre-release rehabilitation.

### I.     Nature and Circumstances of Offense

Mr. Phillips had two contacts with the police in the Spring/Summer of 2019 that resulted in this federal case. Mr. Phillips was indicted for possession of two firearms, on May 8, 2019, and June 7, 2019. Both of these firearms were recovered from Mr. Phillips' person upon police contact (May 8th firearm was dropped when police pursued Mr. Phillips). PSR ¶ 11, 19.

On the early afternoon of May 8, 2019, police made contact with Mr. Philips outside of 140 Quincy Street in Dorchester. Mr. Phillips was drinking with some friends on the porch when officers asked him for identification. Mr. Phillips said he did not have identification on him, but indicated that he lived at that address, and told officers is truthful name and date of birth. When officers started to question him further, Mr. Phillips ran away, dropping a firearm from his pocket down the road. The firearm was a Bryco .380 caliber handgun, with ammunition, manufactured outside of Massachusetts. Police did not locate or arrest Mr. Phillips following this encounter, but an arrest warrant issued.

About a month later, on June 7, 2019, police conducted a traffic stop on a vehicle where Mr. Phillips was a passenger. Mr. Phillips ran from the car before police made contact with him. Police pat-frisked Mr. Phillips, and located a small Taurus firearm in his pocket, with 5 rounds of .380 ammunition (manufactured outside of Massachusetts). Police located suspected crack cocaine in Mr. Phillips' pocket. Mr. Phillips had a prior conviction that prohibited him from legally possessing a firearm. Mr. Phillips was indicted for possession of these two firearms, and accepted responsibility with his plea.

3

On May, 8, 2019, following the first stop, police executed a search of 140 Quincy Street, Bedroom #2 (Mr. Phillips' bedroom). Prior to executing the search warrant, the police ordered all occupants to exit the residence at 140 Quincy Street. The search warrant describes, "140 Quincy street is a **rooming house unit** that has a **total of 5 bedrooms** and is located on the building's second floor…Bedroom #2 is best described as being slightly to the left having entered 140 Quincy St., the second-floor unit, and is located at the front of the building." (emphasis added). The search warrant authorized searches of common areas of the apartment as well as Mr. Phillips' bedroom. In the common area of the rooming house, police located a duffel bag under a sink in the kitchen. The bag had a firearm inside it with an obliterated serial number, as well as hundreds of rounds of various types of ammunition. PSR ¶ 13. Mr. Phillips was not charged with possession of this firearm or any of the ammunition located there. One of the rounds of ammunition located in the bag was .380 ammunition, although the report does not specify any brand names of the ammunition. PSR ¶13-14.

During the search of Mr. Phillips, police recovered his personal papers, driver's license, wallet, a round of .380 ammunition, suboxone strips, plastic bags of field tested cocaine, and paraphernalia. PSR ¶ 14. While it is clear that there is *some* evidence that would connect Mr. Phillips to the common area of the rooming house, the Court can properly find that the government has not met its burden by a preponderance standard to prove Mr. Phillips possessed these items, and that they should not be used to further enhance his guideline range.

## II.   Mr. Phillips' Personal History

Donell was born and raised in the Dorchester area of Boston and is now 33 years old. His childhood was marked by difficulties and chaos. Mr. Phillips was the oldest son, and often a

4

source of support for his mother. His mother herself suffered from substance use disorder, and the family went through periods of homelessness when Donell was a child. He witnessed his mother use drugs in front of him as a child, and witnessed domestic violence. He frequently ran away to his grandparents' home to find stability. Still, his mother relied on Donell as a source of support for his younger siblings. See PSR ¶ 72. His sister writes:

> "While Donell and I had our dads in our lives our younger brothers didn't, however that pretty much went unnoticed as he kept our younger brothers in line and helped my mom take care of them as a father figure would. He would often return home to make sure by brothers are doing the right thing with school and not giving my mom a hard time. My mom has always been so grateful for him to help her raise three boys. Not only does Donell influence our younger brothers he also has two young children of his own that he cares for and tries to keep them as happy as possible. My niece and nephew love to talk about how they cannot wait for their dad to bring them to the park and show him their report card from school." Exhibit A.

Donell Phillips ended up dropping out of high school in the 9th grade. One of his goals is to complete classes and earn his GED once he is released onto supervised release in this case. Due to the COVID-19 outbreak, programming like GED courses are no longer running. Despite his lack of high school degree, Mr. Phillips is an individual who has worked successfully in the past, a good indicator of his ability to do so again in the future. Prior to his current confinement, he worked for two years as a chef and prep cook on the Spirit of Boston cruise ship (2016-2018). PSR ¶ 105. Prior to that job, he worked as a cook at Shubie's Marketplace in Marblehead, again for a 2-year period. PSR ¶ 106. During times of unemployment, Mr. Phillips always found short term and temporary jobs, including at the Franklin Park Zoo and Save-A-Lot retail store. However, in the couple of years prior to his arrest in this case, he lost employment, which led to a downfall in self esteem and a lack of coping skills to handle these setbacks. He loved working

5

as a chef on the Boston cruise ship. The loss of a structure, wages, and enjoyment from his job led him further into depression and substance use. To quote his letter to the Court:

> "Back in May 2019, I was in a dark place. My mind was cloudy with negativity. Drinking heavily, smoking marijuana, popping pills, and using cocaine. Anything to take my mind off realitty (sic). I lose two jobs within 5 years. Broke up with my girlfriend. Which made me feel disturb, less of a man. I was really in a bad state of mind…" See Exhibit B (typed from original).

While Mr. Phillips has never been formally diagnosed with any kind of mental health problem, his struggle with substance use reveals underlying (and untreated) depression. During the Presentence Interview, Mr. Phillips spoke about his struggles with alcohol and drug use, and his desire to get help. He recognized that he was drinking far too much, and using drugs to cope with stress, depression, and loneliness. He described how this descent into depression led to his increased use of substances, and his lack of attention to his family and support network. PSR ¶ 99-101. Mr. Phillips asks to correct paragraph 99 to read that he has tried ecstasy on one occasion, but has used cocaine periodically and with frequency during bouts of depression.

His sister also notes the loss of Donell's grandmother and the profound impact on his life:

> "We had lost our grandmother a few years ago and it has not been easy for him to cope with, she was the foundation to our family and often Donell leaned on her the most. I do believe since losing our grandmother things have been hard for him to deal with but he remained strong for us." Exhibit A.

For Mr. Phillips, rehabilitation should be a primary sentencing goal. Unfortunately, it is unclear when programming in BOP will resume. Because of this lack of rehabilitative programming, further incarceration will only delay Mr. Phillips' progress. He is a young man with a real prospect at turning his life trajectory in a new direction, through the support of U.S.

6

Probation. The longest sentence he has previously served is 60 days, with credit for time served. PSR ¶ 44.

### III. Plea Agreement, Advisory Guidelines, Presentence Report

Mr. Phillips pled pursuant to a plea agreement. He filed objections to the PSR regarding the offense level calculation. The parties are in agreement that Mr. Phillips is properly in Criminal History Category II with 2 points. PSR ¶ 48.

Mr. Phillips pled guilty pursuant to a plea agreement to the two counts charged in the indictment (for possessing a firearm on his person on May 8, 2019 and June 7, 2019). He agrees that the +4 level enhancement applies for the drugs located in the search of his bedroom, and the drugs found on his person. PSR ¶ 29. The plea agreement allows him to contest the government's assertion of additional relevant conduct of a firearm located in a common area of the rooming house where he was staying at the time of the offenses. Plea agreement at 2. Following his timely objection, the government bears the burden of proving Mr. Phillips' possession of this firearm to establish relevant conduct (and the subsequent enhancements that are triggered by its inclusion). Mr. Phillips agrees that the inclusion of the drugs in his bedroom and on his person results in a 4-level increase in the offense level for "connection with another felony offense." PSR ¶ 29. Without the inclusion of the <u>unindicted</u> firearm, Mr. Phillips' base offense level is 18. With acceptance, his total offense level is 15 with an advisory guideline range of 21-27 months. With the inclusion of the unindicted firearm from the kitchen, Mr. Phillips faces a total offense level of 21, with an advisory guideline range of 41-51 months.

Under either guideline calculation, the court must evaluate the 3553(a) factors and impose a sentence that is "sufficient but not greater than necessary" to achieve the sentencing

7

goals. Mr. Phillips asserts that a sentence of 21 months, followed by needed programming during 3 years of supervised release, appropriately balances the goals of sentencing.

V.      **The Guidelines: National Trends**

Nationally, the rate of within-guideline sentences has consistently remained at or below 50%, moving from 52% in FY2012, to 51% in FY2013, to 46% in FY2014, to 47.3% in FY2015, to 48.6% in FY2016, to 49.1 in FY2017, and to 51.4 in FY 2019. See USSC, Comparison Of Sentence Imposed And Position Relative To The Guideline Range, Table 8, FY 2017. In this District, the rate has been well below 50%, from 43% in FY2012, to 39% in 2013, to 23% in FY2014, to 25% in FY2015, to 27.5% in FY2016, to 31% in FY2017 and to 37.2% in FY 2019. See Statistical Information Packet, Fiscal Year 2019, District of Massachusetts.

IV.     **Argument**

As this Court knows, the Sentencing Guidelines no longer bind the Court, and remain one of many factors that the court must consider in reaching a just sentence. *United States v. Booker*, 125 S.Ct. 738 (2005). Under 18 U.S.C. § 3553(a), the Court must impose a sentence that is "sufficient but not greater than necessary" to achieve the goals of sentencing. The court must consider the kinds of sentences that are available, and how to "provide the defendant with the needed **educational or vocational training**, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D) (emphasis added). Rather than a formulaic or rigid approach, the statute requires broad analysis that considers the whole person, circumstances, and how to best support successful reentry into the community. The district court has wide latitude in making individualized sentencing determinations based on a holistic and flexible inquiry, grounded in the 3553(a) factors. *See Gall,* 128 S.Ct. at 594-8; *Kimbrough,* 128

8

S.Ct. at 570, 575-76.

18 U.S.C. § 3553(a) requires that the court shall impose a sentence sufficient but not greater than necessary, a concept referred to as the "parsimony principle." The First Circuit expounded on the meaning and breadth of this tenet in *United States v. Yonathan Rodriguez*, 527 F.3d 221 (1st Cir. 2008). In *Rodriguez*, the First Circuit highlighted that the Supreme Court ruling in *Kimbrough* requires a "more holistic inquiry" and that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, ***a tapestry of factors, through which runs the thread of an overarching principle.***" Id. at 228, emphasis added. This principle "necessarily informs the sentencing court's consideration ***of the entire constellation of section 3553(a) factors…***" Id, emphasis added.

Here, a sentence of 21 months is firmly grounded in a broad and fair consideration of all of the sentencing factors. Mr. Phillips needs rehabilitation. He will truly benefit from the support of U.S. Probation to help navigate the next phase of his life. He is someone who has held steady employment in the past, and could benefit greatly from vocational training opportunities. He wants to earn his GED. He needs substance and mental health counseling. These services simply cannot be met while in custody, especially during this time.

### VI. A Fair Balancing of 3553(a) Factors: Rehabilitation as a Primary Sentencing Goal

Pursuant to 18 U.S.C. §3553(a)(2), the court must consider the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in

the most effective manner.

Here, a primary focus should be on the "kinds of sentencing available" and the need to focus on rehabilitation. At this moment in time, it is unclear that any programming will be available to Mr. Phillips in prison. He has served significant time in custody to date for someone who has never previously served more than 60 days. With a GED and structured programming on probation, he has a chance of being a success story – someone who can come back and mentor and give back to his community. He has strong family support. The programming to set Mr. Phillips on a new path exists: just not in a prison setting.

### A. Overall Sentence

The court can properly consider all of this information to conclude that a variance from the otherwise applicable guideline range is appropriate, based on an overall consideration of the 3553(a) factors. As the court stated in *Rodriguez,*

> "In the final analysis, then, the gloss supplied by *Kimbrough* signifies that a district court should not evaluate a request for a variant sentence piecemeal, examining each section 3553(a) factor in isolation, but should instead consider all the relevant factors as a group and strive to construct a sentence that is minimally sufficient to achieve the broad goals of sentencing. This inquiry should be guided by, but not made unflinchingly subservient to, the concerns expressed in the statute's various sub-parts." Id. at 228.

Here, when the Court considers all the relevant factors as a group, a sentence of 21 months is logical, practical, and supported. The Court must "strive to construct a sentence that is minimally sufficient to achieve the broad goals of sentencing. Here, Mr. Phillips needed to be isolated for a period of time to appreciate the seriousness of the offense. He has been incarcerated now for almost 18 months. He has been separated from his family, without any important rehabilitative programming, and it is time for him to start the next portion of the

10

sentence in the community.

The defense advocates for a 21-month sentence of jail time, followed by structured special conditions of supervised release over a 3-year period. Mr. Phillips has a demonstrated work history, and he will respond well to structure. As a consequence of committing these crimes, he has already experienced 18 months of imprisonment – 9 times longer than any previous incarceration, and served subject to the stress and restrictions of pandemic operations. In light of the current unique situation facing our prisons, and supported by the 3553(a) factors, Mr. Phillips asks the court to impose a sentence of 21 months, followed by 3 years of supervised release, with special conditions as outlined above.

Respectfully submitted,

*/s/ Cara McNamara*
Cara McNamara
AK Bar No. 0511088
Federal Defender Office
51 Sleeper St., 5th Floor
Boston, MA   02210
Tel: 617-223-8061

December 1, 2020.

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 1, 2020.

*/s/ Cara McNamara*
Cara McNamara